to assume that the fact that it was his likeness was disproved. The overthrow of that important part of Mrs. Bell's testimony strikes a fatal blow at her credibility. If the man she lived with in Hamilton was not James Miller, the plaintiffs' case is at an end. So, if she is wrong in her statement that the old man who played with the children in her rooms was Andrew Miller, the case miserably fails. If the man she then lived with was not James, of course the old man was not James' father. To suppose that he would visit his son's paramour while she was living with another man is absurd. There is not one particle of evidence to support her claim that this old man was the testator. No witness ever heard him speak of this woman or of these children. No other person than she ever saw him there. He made them no presents. He was not with them in the street. No one says he took them anywhere. There is not one tittle of evidence that he knew them, except the testimony of this woman, discredited by her history, not probable in itself, and totally uncorroborated. It is incredible that Andrew Miller should have visited these people so frequently and familiarly without some one of Mrs. Bell's friends seeing him there, or some one of his acquaintances hearing him speak of them. In the absence of some testimony of this kind, or of some other kind, to bolster up the testimony of Mrs. Bell, I would not feel at liberty to accept it as decisive of an important case. Unless it is accepted there is nothing to show that Mr. Miller knew of these children, or had any regard for them, or intended to refer to them when he made the devise for the benefit of the wife and children of his son James. The plaintiffs' claim that they are beneficiaries under the will, therefore, falls to the ground. When their case fails there can be no reason for giving them costs out of the estate. They have no more right to bring an action for construction of the will of Andrew Miller, than for the construction of the will of A. T. Stewart. Indeed, the complaint alleges no such object. The action is purely and simply to get one-half of Andrew Miller's estate. The fact that they have failed to get what they prayed for affords no reason why the true owners of the estate should be compelled to pay to them a premium for their efforts to deplete it, by way of a bill of costs. Whatever claim these people might have had, in justice, to share in James Miller's estate, they surely have none in that of his father, who was in no way responsible for them or chargeable with them. The award of costs must follow the usual rule.

Argued before DWIGHT, P. J., and LEWIS, HAIGHT, and BRADLEY, JJ.

M. F. Brown, for appellants.

Geo. W. Miller, for respondents.

PER CURIAM. Judgment appealed from affirmed, with costs, on opinion of RUMSEY, J., at special term. All concur.

(9 Misc. Rep. 235.)

BLUMER et al. v. NATIONAL STARCH MANUF'G CO.

(Supreme Court, Special Term, New York County. June, 1894.)

CONTRACTS—CONSTRUCTION—OPTION.

Defendant agreed to furnish a plant to test plaintiffs' process for manufacturing yeast from the waste products of starch manufacturing, defendant to have the option of an exclusive license under plaintiffs' patents "until the expiration of 60 days from the time when the said experimental plant is in successful operation, and producing yeast * * * in sufficient quantity to enable [defendant] to put the same on the market, and test its availability." *Held,* that the term of option commenced to run when the experiments showed the successful manufacture of yeast from the waste products, and not when the experimental plant was ready for making the tests.

Action by Jacob Blumer and Charles Schlagenhaufer against the National Starch Manufacturing Company on a contract. Judgment for defendant.

Hoadly, Lauterbach & Johnson (George Hoadly, of counsel), for plaintiffs.

Kerr & Curtis (Elihu Root and Edwin B. Smith, of counsel), for defendant.

RUSSELL, J. The determination of the title to patents for the manufacture of yeast is to be reached by the decision in this action. Both parties want the patents,—the plaintiffs struggling to regain the title, and the starch company to retain it. The plaintiffs are skilled chemists, and are the inventors of the valuable processes patented. The starch company is one of the largest manufacturers of starch in this country. After certain preliminary negotiations, by agreement dated the 17th day of June, 1892, the plaintiffs agreed with the starch company: First. That the starch company would examine as to the validity of the patents. Second. If the opinion of counsel as to their validity was favorable, the starch company would pay the patentees $2,500, and furnish a suitable building and equipments, according to plans, etc., furnished by the plaintiffs, "to determine the availability of the said processes for the utilizing, in the manufacture of yeast, the waste product of its processes of manufacturing starch, and the commercial availability of the said inventions and processes for the purposes of its business." Third. The patentees agreed to furnish the plans and specifications, and "will devote their time and attention to erecting and operating the same, under the direction of the officers of the starch company, without compensation, and that they will use their best efforts to put such experimental plant into successful operation as soon as practicable." Fourth. Upon the payment of $2,500, and the furnishing the facilities for the experimental plant, the starch company should have the option of an exclusive license, under the patents, of certain territory, "upon the terms and conditions specified below, until the expiration of the period of sixty days from the time when the said experimental plant is in successful operation, and producing yeast, by the operations described in said patents, in sufficient quantity to enable the starch company to put the same upon the market, and test its commercial availability." Fifth. The option was to be exercised by the starch company within the said period of 60 days by notice in writing and the further payment of $22,500; otherwise, the agreement terminated at the end of said 60 days. The starch company was further to pay the patentees a royalty of 1 cent a pound, and also, out of the net profits, a further sum of $500,000. The further provisions of the contract relate more particularly to the details of the business upon the basis of a successful experiment and realization.

The struggle in this action arises upon the claim of the plaintiffs that the option was not exercised within 60 days, as provided for by the contract, which claim is resisted by the effort of the starch company to show full compliance, either actual or tendered, and

strict conformity with the contract; and the main question, therefore, to be solved, is the actual date when the somewhat indefinite period from which the time began to run really occurred. When was the "said experimental plant in successful operation?" The starch company's plant in Indianapolis was the scene selected by the parties for the experiment. The starch company, under the direction of the patentees, erected an addition to their starch plant for the purpose of the experiment. This starch plant had a capacity for converting daily 2,400 bushels of corn ultimately into starch. It used water for the purpose, and, prior to the introduction of the invention of the plaintiffs to the use of the starch company, the steep water from the starch manufactory passed away as waste product. The invention of the plaintiffs was characterized by them in a communication as early as March, 1892, delivered to the starch company, as "Blumer and Schlagenhaufer's method of utilizing waste products. Our invention has for its purpose to open a new and profitable field to the starch industry by utilizing certain liquid waste products which heretofore were of little value." The minds of the parties were therefore directed, not to the manufacture of yeast from unused corn, but to the successful manufacture of yeast from the waste product of corn, after the corn itself had done its service in the manufacture of starch. The experimental plant was ready for occupation by the middle of August, 1892, and received the liquids from the starch manufactory by pipes connected with vats in the new plant erected for that purpose under the supervision of the plaintiffs. With some delays, not material to the consideration of this action, the experiment was put into operation; and it was discovered prior to the 19th of November, 1892, that yeast of a superior quality could be manufactured, but not without injury to the starch manufactured. Experiments were continued, and especially with the use of sulphurous acid, which would obviate the necessity of crushing the corn, until January, 1893, during the early part of which month it was finally ascertained how the processes of the plaintiffs could be applied to the waste products, and successfully manufacture yeast of fine quality without injury to the manufacture of starch. Prior to that time it had been found impossible or impracticable to manufacture the quantity or quality of starch which was the principal product of the manufacturing enterprise, and at the same time manufacture successfully the yeast from the waste products. During the latter part of January the plaintiffs claimed that the 60 days had expired, while the starch company claimed that this period had not elapsed, and tendered a compliance on their part with the remaining provisions of the contract to entitle them to the license for the use of the patent in the United States and Canada. I cannot agree with the theory of the plaintiffs that the meaning of the agreement between the parties is that as soon as the successful manufacture of yeast became apparent the 60 days began to run, and that this period of 60 days was the time within which the question of the successful operation in connection with the successful manufacture of starch was to be more completely tested. I do not think the time of option began to run upon the instant that the yeast itself, as

yeast, was a commercial success. The parties themselves agreed upon the terms of the contract with reference to the utilization of the processes for the life of the patents. It was a large undertaking, and entirely, so far as the evidence shows, an experiment. There never was much doubt but that yeast might be successfully made of corn, and the minds of all the parties were directed, from the beginning to the end, to the question as to whether the two enterprises could successfully go on together, and produce an enhanced value to the manufacture of corn starch by the utilization of a by-product which had theretofore gone to waste. The parties thus contemplated the stages of expectancy, experiment, and fruition. The days of fruition were those within which, by repeated experiments, the purchasers might determine that the success of the experiment was not intermittent, but constant. There are many details connected with the case, in the large mass of oral and documentary evidence submitted, which are not necessary to consider here. I prefer to decide this case upon the broad ground stated, and hold, as matter of law, from the subject upon which the contract operated with the knowledge of the parties, and the conduct of the parties themselves, as well as the terms of the contract, the period of the beginning of the 60 days' option term did not come until experiment showed the successful manufacture of yeast from the by-product in the manufacture of starch of the same quality as that theretofore used by the starch company in its Indianapolis plant. Judgment therefore goes for the defendant, the starch company, dismissing the complaint. Judgment for defendant.